Ben F. Read and Mary K. Read v. Commissioner. T. B. Knox and Winnie J. Knox v. Commissioner.
Read v. Commissioner
Docket Nos. 39765, 43481.
United States Tax Court
1954 Tax Ct. Memo LEXIS 309; 13 T.C.M. (CCH) 123; T.C.M. (RIA) 54044; February 9, 1954
*309 On January 17, 1948, Ben F. Read and T. B. Knox sold to Texmass Petroleum Company an option to purchase 2/3 of the shares of its stock owned by one Homer W. Snowden. They had held such option for more than 6 months. The sale was effected by contracts which purported to pay them for services rendered and to be rendered to the company. During 1948 and 1949, pursuant to the contracts, they received payments totaling $145,833.27. Held, such payments were long-term capital gains realized from the sale of a capital asset. J. Ralph Howell, Jr., Esq., and Lanham Croley, Esq., 721 Republic Bank Building, Dallas, Tex., for the petitioners in Docket No. 39765. J. M. McMillin, Esq., and W. B. Goode, C.P.A., for the petitioners in Docket No. 43481. John Alexander, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion These consolidated proceedings involve deficiencies in income tax as follows: Docket
Taxpayer
No.
Year
Amount
Ben F. Read and
Mary K. Read
39765
1948
$19,965.42
1949
28.86
T. B. Knox and
Winnie J. Knox
43481
1948
$13,352.25
1949
362.14
The issues to be determined are whether payments by *310 the Texmass Petroleum Company to petitioners, Ben F. Read and T. B. Knox, during the years in question were for services rendered; or, for the sale by them of an option to purchase stock; or, were in payment of their failure to exercise such option within the meaning of section 117 (g) (2) of the Code. [1]
Other adjustments made in the deficiency notices have not been contested and will be taken into account under a Rule 50 computation. Findings of Fact Ben F. Read (hereinafter referred to as Read) and Mary K. Read were husband and wife during the years in question, and residents of Dallas, Texas. T. B. Knox (hereinafter referred to as Knox) and Winnie J. Knox) were husband and wife, and residents of Weatherford, Texas. Each couple filed joint returns on the cash receipts and disbursements basis with the collector at Dallas. Since 1936 Knox was actively engaged in *311 the oil business, both as a developer of leaseholds, and in drilling wells for others. In the summer of 1946, he drilled a number of wells for Homer W. Snowden (hereinafter referred to as Snowden) on leaseholds which Snowden was developing in New Mexico. In the course of such work, Knox became friendly with Snowden and familiar with his financial problems in connection with the development of extensive oil properties which he held. In August 1946, Knox loaned Snowden the sum of $60,000. At that time Snowden held a 23 1/2 per cent interest in the Snowden Oil and Gas Company, Ltd. The remainder of the interest was held by a group of Boston, Massachusetts, investors (hereinafter referred to as the Harriman Group). The principal difficulty which Snowden faced in the development of his oil properties was the problem of securing and maintaining adequate working capital. As a possible solution to this difficulty, Knox suggested that long-term financing through insurance companies or large investment houses be secured. As a preliminary step towards this end, the Texmass Petroleum Company (hereinafter referred to as Texmass) was incorporated under the laws of the State of Texas on October 23, 1946. Texmass *312 issued 80 per cent of its authorized stock to Snowden, Ltd., in exchange for the assets and liabilities of that partnership. Snowden held 1,880 shares of such stock and the Harriman Group the remainder. On November 15, 1946, Snowden gave Knox an option to purchase, at $50 per share, 2/3 of his 1,880 shares. The right to exercise the option continued until November 15, 1947, or until an audit of Texmass' books was completed. The audit was not completed until sometime after January 17, 1948. Knox first approached the Equitable Life Assurance Company in an effort to interest it in undertaking the long-term financing of the Snowden properties. Also in the Fall of 1946, Knox began borrowing large sums from the Mercantile National Bank of Dallas (hereinafter referred to as Mercantile) to provide interim financing for Texmass. Read was the vice-president of Mercantile and had known Knox for some 35 years or more. In the course of negotiating the loans with Mercantile, Knox attempted to induce Read to take a 1/2 interest in the option to purchase Snowden's stock. Knox indicated that as soon as a long-term financing plan was worked out, he wanted Read to join with him in the active management *313 of Texmass. Read refused at the time to share in the option because of his position in the bank which was making substantial loans to Texmass. He indicated, however, that when the long-term financing for the company had been arranged, he would consider accepting Knox's offer. Negotiations were next undertaken with the Massachusetts Mutual Life Insurance Company (hereinafter referred to as Mass-Mutual) and the John Hancock Mutual Life Insurance Company (hereinafter referred to as John Hancock) to secure an $8,000,000 loan. In December 1946, Knox, who was now an officer and director of Texmass, secured an option from the Harriman Group to purchase its outstanding shares of stock which would in turn leave Snowden's shares as the only outstanding stock. Knox was reluctant to exercise his option to purchase 2/3 of Snowden's shares at that time, because of the poor working-capital condition of Texmass. In January 1947, Knox gave a letter to Read, referring to their conversations of the previous Fall. The letter stated that his offer to give Read a 1/2 interest in the option was still open and that he hoped Read would join with him as soon as the refinancing of Texmass had been settled. *314 Knox and Read made several trips to Boston to discuss the proposed loan with the insurance companies. Read submitted his expenses for such trips to the bank which in turn billed Texmass. This followed the customary practice of having the borrower bear the cost of all loan negotiations. In the Spring of 1947, the insurance companies agreed to make the $8,000,000 loan in which the Mercantile Bank was to participate to the extent of $500,000, and would act as the trustee for the insurance companies. In the latter part of April 1947, $4,100,000 of such loan was closed. A part of this sum was used to purchase the shares held by the Harriman Group for the sum of $1,018,533.75, leaving Snowden's stock as the only outstanding shares. In May 1947, after the closing of the $4,100,000 loan from the insurance companies, Read agreed to participate with Knox in the option which the latter held to purchase 2/3 of Snowden's shares. Read fully advised Thornton, Chairman of Mercantile's Board of Directors, of his interest in the option. The Mass-Mutual was also apprised, in May 1947, of Read's interest in the stock option. Knox and Read, however, were still reluctant to exercise the option since *315 an audit of Texmass' books had not been completed. Texmass continued to be very short of working capital. After accepting a 50 per cent interest in the option, Read talked with officers of the Texas Bank and Trust Co. and arranged for a loan at such time as he might be ready to exercise his rights under the option. The final portion of the $8,000,000 loan was closed in August 1947, at which time Read was also elected to the board of directors of Texmass at the request of Mass-Mutual. Throughout this period, Snowden remained in complete control of the operations of Texmass, and Knox continued to advise him with respect to such operations. Among the vast properties of Snowden, Ltd., which had been transferred to Texmass, were leaseholds in which another group of Boston investors (hereinafter referred to as the Syndicate) had substantial interests. Roger E. Morse (hereinafter referred to as Morse) acted as trustee for this group. During the Fall of 1947, this group, which had advanced considerable sums to Snowden, became increasingly dissatisfied with his management of Texmass. In October 1947, Snowden, Read, and Knox gave to one T. F. Morrow, as agent for the Cities Service Oil Co. *316 , an option to purchase the outstanding shares of Texmass' stock for $25,000,000. The future net value of Texmass' holdings had been appraised at approximately $30,500,000. The present value of its holdings had been appraised at approximately $18,300,000 with debts of approximately $10,000,000, leaving a net book value for the stock of $8,300,000. Negotiations with Cities Service collapsed, and, in order to secure much needed working capital for the company's operation, Snowden began negotiations with Morse to secure additional funds from the Syndicate. In the course of such negotiations, Morse asked Knox several times when and if he planned to exercise his option. Knox indicated to Morse that he and Read might consider selling the option for $1,500,000. Snowden made trips to Massachusetts to talk with Morse and members of the Syndicate in December 1947 and January 1948. In the course of those negotiations, Snowden reminded Morse that Knox and Read held an option to purchase 2/3 of his 1,880 outstanding shares of stock; and also stated that the two men claimed substantial fees for services which they had performed in connection with the interim financing of Texmass, for which they *317 had never been compensated. Shortly before Snowden went to Massachusetts in January, Knox advised him that he and Read would consider accepting a price of $250,000 for the option. The culmination of Snowden's negotations in Boston was that the Syndicate would supply $1,025,000 in exchange for 4,100 shares of Texmass' treasury stock. Snowden agreed to use his best efforts to get Knox and Read out of the Texmass picture. During the course of these negotiations, Morse had telegraphed to Knox for a copy of the option. Knox and Read refused to forward a copy to Morse. Morse came to Dallas about the middle of January 1948, and talked with Knox and Read about the possibility of buying their option which they were still reluctant to exercise in view of the company's lack of working capital. An agreement, however, was finally reached with Morse who accepted their offer to sell the option for $250,000. On January 17, Morse, Snowden, Knox, Read, and others held a meeting in the offices of Golden, Croley & Howell, attorneys for Knox and Read. As the conference began, Morse stated that he had just talked with his attorney in Boston and had been advised that the group which he represented could *318 not purchase the option which Read and Knox held, since, under Texas law, it was illegal for an insolvent corporation to purchase its own stock and that the Syndicate feared that Texmass was, in fact, then insolvent. As an alternative means of consummating the purchase, it was suggested that "employment" contracts be prepared whereby Knox and Read would be paid the sum of $250,000 for services previously rendered, and to be rendered over a 3-year period. Both Knox and Read vigorously protested such an arrangement. After much argument, which continued throughout the remainder of the day, "employment" contracts were finally prepared. One contract provided for payment to Read and Knox of $100,000 for all claims against the company including services which they had previously rendered to it. Another provided for payment to them of $150,000 over a 3-year period for advice and services which they agreed to perform. This contract referred to Read and Knox as a partnership, the reason being that the payments could then be made in full, even though one of them might die before the expiration of the 3-year period. The attorney, Golden, who drew these instruments, expressed doubt that a proper *319 contract could be drawn for services which the parties did not expect to perform. As a part of the consideration for the payment for "past services", Read and Knox agreed to release all claims which they might have against the company. A document was also drawn between Snowden, and Read, and Knox releasing any claims which they might have against one another. A notation was made at the bottom of the letter, in which Snowden had granted Knox the option to purchase the 1,254 shares, by which Knox and Read released all claims thereunder. To induce Read and Knox to execute the "employment" contracts as they were prepared, Snowden assigned to Knox two automobiles, a spudder, and interests in certain leaseholds which Snowden was to acquire. Knox never received anything but the two automobiles, which he was then using, and the spudder. Texmass issued a check in the amount of $100,000 payable to Knox and Read on January 21, 1948. The funds from which such payments were made were a part of the $1,025,000 which the Syndicate put into Texmass through loans rather than by purchasing its treasury stock as originally intended. Read and Knox resigned as directors of Texmass on January 17, 1948. *320 On January 18, upon examination of Texmass' books and a day-long discussion with its accountant, Morse discovered that the company owed many liabilities which Snowden had failed to disclose. The following day, he persauded Snowden to relinquish all control in Texmass by surrender of his 1,880 shares of stock. A certificate for 200 shares was then issued to Morse, which was paid for with $50,000 of Syndicate funds. For several months payments of $4,166.66 were made jointly to Knox and Read. The vouchers attached to these checks stated that they were in payment for services. When Read first noticed this notation, he expressed his objection to the company, and the vouchers on subsequent checks contained the notation that they were issued "as per contract". In January 1949, the Syndicate, as well as the insurance companies, raised vigorous objection to the payments being made to Knox and Read pursuant to the contracts which had been executed the previous January. They threatened to cancel the contracts and sue the two men to reclaim all moneys previously paid. Upon the advice of an official of the company, in whom both Knox and Read had complete confidence, they agreed to execute *321 a release of future claims for payments from Texmass; and Texmass released any claims which it might have against them. Knox and Read received a total of $141,666.61 in 1948 from Texmass, and the sum of $4,166.66 in 1949. Amendment No. 3 to Form S-1, entitled "Registration Statement under The Securities Act of 1933", filed by Texmass with the Securities and Exchange Commission on March 21, 1950, reads as follows: [Page 12] "On or about November 15, 1946, Mr. Snowden gave to Mr. T. B. Knox, an independent oil operator in Weatherford, Texas, an option to purchase at $50 per share 1,254 shares of the 1,880 shares of Texmass stock to which he would become entitled upon dissolution of Snowden, Ltd. * * *" [Page 14] "In January, 1948, the so-called Syndicate Group, made up principally of large investors in the various Investors' Groups, was formed to provide Texmass with needed additional capital. The Syndicate required Mr. Snowden to surrender control of Texmass. He donated his 1,880 shares of stock to Texmass and, in connection therewith, Texmass purchased the option given to Mr. Knox with respect to 1,254 of such shares for $145,833. * * *" [Page 57] "Transactions in Treasury
Stock resulting in a Capi-
tal Surplus (Deficit) were
as follows: 6,120 shares acquired in
May, 1947, at a cost of
$1,018,533.75
In January, 1948, H. W.
Snowden, retiring presi-
dent, contributed his 1,880
shares of stock to the
Treasury of the Company.
In connection with this
transaction, it was neces-
sary for the Company to
purchase an option out-
standing against 1,254
shares (of the 1,880
shares contributed) at a
cost of
145,833.27
Total Cost of Shares Ac-
quired
$1,164,367.02"
*322 * * *
The highest salary which Texmass paid to any official during 1948 and 1949 was $15,000. On January 17, 1948, Knox and Read sold to Texmass an option which they had held for more than 6 months, to purchase 1,254 shares of its stock, then owned by Snowden. Knox and Read received no payments in 1948 or 1949 for any services rendered to Texmass prior to or after January 1948. Opinion RICE, Judge: The question presented to us is solely one of fact. We have found that Knox and Read held an option to purchase 2/3 of Snowden's shares of Texmass' stock; that the option was held by them for more than 6 months; and, that it was sold by them to Texmass on January 17, 1948. Hence, on our findings, we reject respondent's determination that the sum of $141,666.61 paid to them in 1948, and the sum of $4,166.66 paid in 1949, was compensation for services rendered. We agree with the petitioners that the sale of the option was a sale of a capital asset and that they correctly reported the profit therefrom as a long-term gain on their returns for the years in question. G.C.M. 23677, 1943 C.B. 370. A review of the facts set forth in our findings is unnecessary here. Suffice *323 it to say that the testimony of petitioners, Knox and Read, was forthright and convincing and was corroborated by that of the witnesses whom they called, and by many documents submitted as a part of the record. Unquestionably, both men performed services which were of great value to Texmass. Much that Read did was, of course, in line of duty as a vice-president of the Mercantile Bank. But this interest and activity in behalf of Texmass above and beyond that, and certainly Knox's efforts, came not from any hope of compensation as such from Texmass, but from the hope that whatever could be done for the company would enhance the value of the option which they held and eventually place them in control of vast and profitable oil properties. Their reluctance to exercise the option prior to the time of selling it is understandable. Two men of their long business experience would not likely have invested capital in a corporation whose whole history up to that time had been one long struggle to acquire and maintain adequate working capital even though it owned interests in oil properties of great proven and potential value. We note, in passing, that the same reason may well have prompted *324 the Morse Group to change from a plan of stock purchasing to one of making loans, as a means of putting additional funds into Texmass. We have given exceptionally careful consideration to the testimony of R. E. Morse, since it conflicts on some important points with that of other witnesses. However, such background, as Morse knew of the petitioners' interest in and activity in behalf of Texmass, was learned primarily from Snowden. The record is vague as to just what statements Snowden made to him during the January 1948 negotiations. It is our conclusion, on the basis of the record as a whole, that the testimony of Morse with respect to the services performed and to be performed by the petitioners as the consideration for the payment of $250,000, to the extent it conflicts with the other written evidence and testimony, is not credible. The respondent has placed much emphasis on Read's conflict of interests in that he was an officer of the bank which was making loans to a corporation in which he held, at least, a potential interest. While Read made a full disclosure of his option rights to Thornton, the Chairman of Mercantile's Board and its senior officer, his compunctions with *325 respect to his position, no doubt, were in part responsible for his reluctance to sign the "employment" contracts. We think the record, however, demonstrates that any such apprehensions on his part were but an added reason for not wanting to sign "employment" contracts when, in substance and in fact, he was selling a capital asset. Respondent also argues that the sums received by Knox and Read were in payment for their failure to exercise the option, within the meaning of section 117 (g) (2) of the Code. The facts before us clearly indicate that the effect of the transaction was a sale to Texmass at the instigation of Morse and his associates; and, the fact that the formalities of that transaction included a release of the option to Snowden, make it none the less so. See Seth M. Milliken, 15 T.C. 243 (1950), affd. in part 196 Fed. (2d) 135 (C.A. 2, 1952), certiorari denied 344 U.S. 884 (1952), rehearing denied 344 U.S. 910 (1952). Decisions will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(g) Gains and Losses from Short Sales, Etc. - For the purpose of this chapter - * * *
(2) gains or losses attributable to the failure to exercise privileges or options to buy or sell property shall be considered as short-term capital gains or losses.↩